UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LISA ELLIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 03 C 3402 |
| | ) | |
| ELGIN RIVERBOAT RESORT d/b/a | ) | Judge Rebecca R. Pallmeyer |
| GRAND VICTORIA RIVERBOAT, | ) | |
| NEVADA LANDING PARTNERSHIP | ) | |
| AND RBG, L.P., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Defendant Elgin Riverboat Resort d/b/a Grand Victoria Riverboat operates a riverboat casino. Plaintiff Lisa Ellis, an African-American female, worked at the casino in 1994-95. In 1998, she unsuccessfully re-applied for a dealer position. Plaintiff, along with several other rejected African-American applicants, then filed a Title VII race discrimination lawsuit against the casino. While that lawsuit was pending in March 2003, the General Manager of the casino sent a letter to all persons engaged in litigation with the casino, including Plaintiff, informing them that they were no longer allowed on casino property.

Plaintiff alleges that the letter was sent in retaliation for her participation in the 1998 Title VII suit.[1] Defendant moves for summary judgment on the retaliation claim, arguing that Defendant lacked any retaliatory motive and that Plaintiff suffered no cognizable harm. For the reasons explained here, Defendant's motion for summary judgment is granted.

---

[1] Plaintiff filed the present lawsuit along with another of the plaintiffs from the 1998 Title VII suit, Derrick Denson. After Defendant's 12(b)(6) motion to dismiss was denied by this court on August 1, 2003, Denson settled with Defendant and was dismissed from this action.

## FACTS

Defendant Elgin Riverboat Resort d/b/a Grand Victoria Riverboat[2] operates a riverboat casino, the Grand Victoria. (Defendants' Local Rule 56.1 Statement of Material Facts (hereinafter, "Def.'s 56.1") ¶ 2.) The Grand Victoria, a state-licensed gaming facility, is located on the Fox River in Elgin, Illinois. (Def.'s 56.1 ¶ 1.) In an adjacent pavilion building, Defendant operates restaurant and tavern facilities, as well as a parking garage. (Def.'s 56.1 ¶ 2. Defendant employs approximately 1600 employees at the Elgin facilities, which are frequented by thousands of members of the public on a daily basis. (Def.'s 56.1 ¶ 2.) From February 19, 2002 to the present, Defendant's overall operations at the Grand Victoria, including human resources, have been overseen by General Manager Randall Roberts. (Def.'s 56.1 ¶ 1.)[3]

Plaintiff Lisa Ellis, an African-American female, was last employed at the Grand Victoria casino in 1994 and 1995. (Def.'s 56.1 ¶¶ 9-10; Ellis Dep., at 11.)[4] In 1998, three years after leaving Grand Victoria, Plaintiff re-applied for a position at the casino but was not hired. (Plaintiff's

---

[2] The other named defendants, Nevada Landing Partnership and RBG, L.P., each own 50% of Elgin Riverboat Resort. For purposes of this decision, the terms "Defendant" and "Grand Victoria" will encompass all defendants.

[3] Plaintiff's 56.1 Statement states that she lacks knowledge of who was running the operations at Grand Victoria, but "for purposes of this pleading accepts [Defendant's assertion] as true." (Pl.'s 56.1 ¶ 1.) Accordingly, this fact is deemed admitted.

[4] Plaintiff further asserts that she was employed as a dealer, that she received high ratings, that she was never disciplined, and that she resigned because of medical problems. (Ellis Aff., Ex. 1 to Plaintiff's Memorandum of Law in Support of her Response in Opposition to Defendant's Motion for Summary Judgment, ¶¶ 3-5.) Plaintiff neglected to present these facts in her 56.1 Statement of Material Facts, as required by Local Rule 56.1 (the non-moving party must submit additional facts in short numbered paragraphs), however, and instead presented these facts only in her brief and attached affidavit. In any event, the details of Plaintiff's previous employment, while possibly relevant to her 1998 lawsuit, have no relevance here.

Memorandum of Law in Support of her Response in Opposition to Defendant's Motion for Summary Judgment (hereinafter, "Pl.'s Response"), at 2.) On November 5, 1998, Plaintiff, along with other African-American applicants, filed a Title VII lawsuit against Grand Victoria, alleging that they had been rejected for dealer positions because of their race. (Def.'s 56.1 ¶ 10.) Magistrate Judge Martin Ashman granted summary judgment in favor of Defendant on that lawsuit in September 2004. *Ellis v. Elgin Riverboat Resort*, No. 98 C 7093, 2004 U.S. Dist. LEXIS 18971 (N.D. Ill. Sep. 21, 2004).

In March 2003, Plaintiff received from her attorneys a copy of a letter (hereinafter, "trespass letter") sent by General Manager Roberts to Plaintiff's attorneys. (Def.'s 56.1 ¶ 12; Letter from Roberts to Ellis of 3/15/03, Tab B, Ex. 1 to Def.'s 56.1.) The letter stated: "[a]ny person who is engaged in litigation with Grand Victoria Casino . . . will be trespassed [sic] from casino property during the pendency of that litigation and for 120 days following the conclusion of the litigation." (*Id.*) Attorneys representing litigants were barred as well.[5] (*Id.*) The trespass letter defined "litigation" as including civil lawsuits pending in state court, federal court, or in administrative proceedings. (*Id.*) The letter did not reveal what the penalty would be for a trespass, and it contained no reference to any particular subject matter of litigation. (*Id.*)

Plaintiff felt insulted by the letter and thought it was "ignorant." (Def.'s 56.1 ¶ 19; Ellis Dep., at 32:17-33:1.) She testified that in her view, "whoever sent it was very immature," but acknowledged that she "wasn't really upset" by it. (Ellis Dep., at 32:23-25.)

It is undisputed that between the time she filed the 1998 Title VII lawsuit and her receipt of the trespass letter in March 2003, Plaintiff had not visited the Grand Victoria casino for any

---

[5] The letter provided an exception for litigants presently employed by the casino, who would be allowed on the premises during their working hours only. (Def.'s 56.1 ¶ 6.)

reason. (Def.'s 56.1 ¶ 15.) Since 1998, she has not applied for employment at the casino, has not monitored employment openings, and has no intention of ever applying for employment there in the future. (Def.'s 56.1 ¶¶ 15-16.)[6] In fact, Plaintiff has no intention of visiting the casino for any reason.[7] (Def.'s 56.1 ¶ 16.)

Notwithstanding her stated lack of intent to apply for employment at the Grand Victoria casino, it is undisputed that Plaintiff, if she desired to do so, has the option of mailing an employment application or submitting it over the Internet. (Def.'s 56.1 ¶ 17.) According to General Manager Roberts, slightly fewer than one third of all casino employment applications are submitted online. (Def.'s 56.1 ¶ 17; Roberts Aff. ¶ 7, Tab A to Def.'s 56.1.) In addition, as Defendant's attorneys explained in a July 2003 letter, if Plaintiff wanted to apply in person, she could do so by making

---

[6] Plaintiff is currently employed as a mortgage broker and real estate agent, earning approximately $70,000 to $80,000 a year. (Def.'s 56.1 ¶ 14.)

[7] Plaintiff did not dispute this fact in her Local Rule 56.1 response. (Pl.'s 56.1 ¶ 16.) In an affidavit (filed later with her opposing brief), however, Plaintiff states that she "quite possibly may have gone there alone, or with friends for entertainment and recreation, but was prevented from doing so by the threatening letter Grand Victoria sent." (Ellis Aff. ¶ 12, Ex. 1 to Plaintiff's Memorandum of Law in Support of her Response in Opposition to Defendant's Motion for Summary Judgment, ¶ 12.) This statement directly contradicts her admission, in her 56.1 response, that she does not "have any intention of even visiting the casino for any reason." (Def.'s 56.1 ¶ 16) Further contradiction is found in her deposition testimony, where she testified, "I've had no interest in going to the casino." (Ellis Dep., at 29:25.) In addition, when responding to a question as to whether she was interested in pursuing employment at the casino, she answered, "no, I was not – I was not – I couldn't – right, correct. I couldn't understand why I even received the letter. I hadn't been on the property. And I was [sic] even thinking about going to the Grand Victoria Casino for any reason." (Ellis Dep., at 23:12-21). (Although the word "not" is absent from the deposition transcript before the word "even", the context of her answer clearly suggests the word was omitted from the transcript.) As both her deposition testimony and 56.1 response establish her lack of intent to visit the casino, Plaintiff's later speculative assertion to the contrary in her affidavit will be disregarded. See Beckel v. Wal-Mart Assocs., Inc., 301 F.3d 621, 623 (7th Cir. 2002) (affidavits offered to contradict the affiants' deposition are "entitled to zero weight in summary judgment proceedings unless the affiant gives a plausible explanation for the discrepancy.").

4

arrangements in advance with Grand Victoria's Human Resources Department. (Def.'s 56.1 ¶ 18.) She would be escorted by security staff at all times while on the premises. (Letter from Rice to Flaxman of 7/01/03, Tab F to Def.'s 56.1.)

The parties dispute Defendant's motive in sending the trespass letter. Plaintiff argues that the letter was sent to her in retaliation for her 1998 Title VII lawsuit (Pl.'s Response, at 4), while Defendant denies any retaliatory motive. (Def.'s 56.1 ¶ 8.) Instead, Defendant explains that due to its high volume of customers and labor-intensive operations, the casino faces a constant stream of personal injury, workers' compensation, and employment-related lawsuits.[8] (Def.'s 56.1 ¶ 3.) According to Defendant, certain casino patrons have a "track record" of filing multiple lawsuits, usually for personal injury claims (Def.'s 56.1 ¶ 4); further, some attorneys who were involved in litigation against the casino disrupt casino operations by soliciting casino employees during work shifts. (Def.'s 56.1 ¶ 5.) General Manager Roberts became aware of these problems after discussions with Grand Victoria's Human Resources Manager, Sharon McGill, in early 2003. (Def.'s 56.1 ¶¶ 4-5.) To address the issue, Roberts decided to send the trespass letter to anyone engaged in any type of litigation against the casino, as well as their attorneys. (Def.'s 56.1 ¶ 6.) Seventy-five such letters bearing Roberts' signature were sent out on March 15, 2003. (Def.'s 56.1 ¶¶ 6, 7.) Defendant acknowledges that Roberts was aware of Plaintiff's 1998 Title VII lawsuit, but denies that his decision to send the trespass letters was motivated by any desire to punish or retaliate against Plaintiff. (Def.'s 56.1 ¶ 8.)

---

[8] Here again, Plaintiff claims to have no knowledge of the truthfulness of Defendant's assertions, but "for purposes of this pleading accepts them as true." (Pl.'s 56.1 ¶ 3.) Accordingly, the fact must be deemed admitted.

5

Defendants point out that all litigants, regardless of the subject matter of the litigation involved, received the same letter. (Def.'s 56.1 ¶ 6.) Including the seventy-five sent out on March 15, 2003, Defendant asserts that it has sent 127 letters, twenty-six of which were sent to litigants (and their attorneys) who were pursuing employment discrimination claims. (Def.'s 56.1 ¶ 7.)[9] The overwhelming majority of trespass letters were sent to litigants involved in personal injury, premises liability, or workers' compensation claims. (Def.'s 56.1 ¶ 7.)

Plaintiff argues that Defendant's claim of patrons who file multiple suits is "misleading." (Plaintiff's Response to Defendants' Local Rule 56.1 Statement of Material Facts (hereinafter "Pl.'s 56.1") ¶ 4.) She contends that Defendant's reasons for sending her the trespass letter, and Defendant's assertions of sending multiple trespass letters to other litigants, are "pretextual." (Pl.'s 56.1 ¶ 5-8.) Rather than directly disputing Defendant's statements of fact and offering evidence to controvert those statements, however, Plaintiff merely claims that she "has no way of knowing the truthfulness of defendants' assertions."[10] (Pl.'s 56.1 ¶¶ 4-8.)

---

[9] Defendant also offers an unaddressed, undated form copy of the trespass letter (Unaddressed letter from Roberts, Tab A, Ex. 1 to Def.'s 56.1). The text in this copy of the trespass letter is identical to the one Plaintiff received, except that it begins with the statement "[i]n consistency with Grand Victoria Casino's existing policy[.]" (Id.; compare Letter from Roberts to Ellis of 3/15/03, Tab B, Ex. 1 to Def.'s 56.1.)

[10] Curiously, while emphatically denying any knowledge of Defendant's reasons for sending the trespass letters and the existence of other letters, Plaintiff simultaneously states that it is "incorrect" that she had no knowledge of Defendant's reasons for issuing the letter, or who else received a letter besides her attorneys and herself. (Pl.'s 56.1 ¶ 13.) In response to Defendant's assertion in its 56.1 Statement that she lacked such knowledge, Plaintiff cites to an exchange in her own deposition, in which she was asked "you don't have any knowledge or information about the full list of people who would have been sent this letter, do you?" (Ellis Dep., at 14:1-3.) Plaintiff answered, "I never know who – no, I don't. I don't – I do not." (Ellis Dep., at 14:4-7.) Plaintiff attempts to characterize this exchange as insufficient to establish that she had no knowledge or
(continued...)

6

She contends that no information regarding other casino litigants, or Defendant's reasons for sending the trespass letter, was made available to her during discovery, or at any time before Defendant filed for summary judgment. (Pl.'s 56.1 ¶¶ 4-5; Pl.'s Response, at 3.) The court notes, however, that in its Rule 26(a)(1) initial disclosures, Defendant listed Roberts and Sharon McGill as having "knowledge of the circumstances surrounding Grand Victoria's issuance of a 'trespass letter' ... including the legitimate business rationale for the issuance of the letter." (Def.'s Rule 26(a)(1) Disclosures, Ex. A to Defendant's Reply Brief in Support of Motion for Summary Judgment.) Plaintiff thus had notice and opportunity to obtain such information in discovery, and cannot now use her failure to do so as a method of manufacturing a factual dispute.[11]

Under Local Rule 56.1(3), facts set forth in the moving party's statement are deemed admitted unless controverted with specific references to the record. Accordingly, Defendant's assertions regarding its reasons for sending the letter, the existence of other litigants, the number of letters sent, and the assertion that the letters went to all litigants, must be accepted as fact.

## DISCUSSION

I.   **Summary Judgment Standard**

Defendant moves for summary judgment on Plaintiff's claim. Summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that

---

[10] (...continued) information bearing on Defendant's reasons or other recipients, and notes that the examiner did not pursue the subject (Pl.'s 56.1 ¶ 13), but the plain meaning of the question and answer satisfies the court that she had no knowledge of the other recipients' identity.

[11] Plaintiff also attacks Roberts' affidavit as "inherently suspect" because it was executed the day that Defendant filed its Motion for Summary Judgment. (Pl.'s Response, at 3; Roberts Aff., Tab A to Def.'s 56.1.) In the court's experience, obtaining a witness's signature on an affidavit at or near the time of filing a summary judgment motion is not at all unusual or suspicious.

7

the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). All evidence and inferences must be viewed in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The nonmoving party must support its contentions with admissible evidence and may not rest upon the mere allegations in the pleadings or conclusory statements in affidavits. *Celotex*, 477 U.S. at 324.

Plaintiff, citing *McCoy v. WGN Continental Broadcasting Co.*, 957 F.2d 368, 370 (7th Cir. 1992), argues that the summary judgment standard is applied with "added rigor" in employment discrimination cases. As the Seventh Circuit has confirmed, however, the standard for deciding a summary judgment motion is the same in employment cases as in all other cases. *Alexander v. Wisconsin Dept. of Health and Family Services*, 263 F.3d 673, 680 (7th Cir. 2001). The nonmoving party must set forth specific facts showing that there is a genuine issue of material fact and that the moving party is not entitled to judgment as a matter of law. *Anderson*, 477 U.S. at 252.

## II. Plaintiff's Title VII Standing

Plaintiff alleges that Defendant retaliated against her for her participation in the 1998 Title VII race discrimination lawsuit. Title VII prohibits employers from retaliating against an employee or applicant for employment who makes a charge of discrimination against an employer. 42 U.S.C. § 2000e-3(a); *Flowers v. Columbia College Chicago*, No. 04-2899, ___ F.3d ___, 2005 WL 287979, *1 (7th Cir. Feb. 8, 2005) ("No employer may retaliate against someone who makes or supports a charge of discrimination against *any* employer."). Retaliation is unlawful even if the underlying charge turns out to have been incorrect, so long as the charge was not "utterly baseless." *Mattson v. Caterpillar, Inc.*, 359 F.3d 885, 891 (7th Cir. 2004).

8

Whether a plaintiff can pursue a claim of retaliation under Title VII depends on her employment status, the nature of the retaliatory act, and the retaliatory act's relation to her employment. *See Veprinsky v. Fluor Daniel, Inc.*, 87 F.3d 881, 891 (7th Cir. 1996) (former employee could pursue retaliation claim for post-employment retaliation, where the employer informed a placement agency of the employee's pending EEOC charge and gave false information to the employee's new employer). If the plaintiff is a current employee, she can sue for a retaliatory act even if it is not directly related to her employment. *Aviles v. Cornell Forge Co.*, 183 F.3d 598, 605 (7th Cir. 1999) (court has suggested that "retaliatory activity in the pre-termination context need not be job related"); *McDonnell v. Cisneros*, 84 F.3d 256, 259 (7th Cir. 1996) ("it is obvious that effective retaliation against employment discrimination need not take the form of a job action."). The retaliatory act must, however, be one that "causes her to suffer a real harm." *Johnson v. Cambridge Industries, Inc.*, 325 F.3d 892, 902 (7th Cir. 2003).

Former employees may proceed under Title VII as well, since the Supreme Court has construed "employee" to include both current and former employees. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997). Retaliatory acts that "impinge on future employment prospects" or have a "nexus to employment" are actionable for former employees. *Veprinsky*, 87 F.3d at 891. Such a claim requires that the retaliation resulted in "some type of concrete injury" to the employee's future employment prospects. *Id.* at 894-95; *see Flannery v. Recording Industry Assoc. of America*, 354 F.3d 632, 643 (7th Cir. 2004) (retaliation claim cannot be based on "speculative theories").

The question of whether a former employee can sue under Title VII for retaliatory acts which are *unrelated* to employment is more difficult. *See Flannery*, 354 F.3d at 642 n.3 (noting that the Seventh Circuit has "not been entirely clear on whether an employment nexus is necessary" for a

9

former employee to state a retaliation claim). In *Veprinsky*, which established that former employees may sue for acts related to employment, the court explicitly declined to answer whether a retaliatory act *unrelated* to employment is actionable. 87 F.3d at 892; *cf. Ishkhanian v. Forrester Clinic S.C.*, No. 02C9339, 2003 WL 21479072, *2 (N.D. Ill. June 25, 2003) (noting that "*Veprinsky* does not squarely hold that a nexus to employment is always required.").[12] In any event, assuming that a former employee may challenge a retaliatory act that is unrelated to employment, this court is confident that the threshold must be at least as high as it is for current employees; that is, the plaintiff must make a showing of "real harm." *See Johnson*, 325 F.3d at 902; *Schobert v. Illinois Dep't of Transp.*, 304 F.3d 725, 731 (7th Cir. 2002) ("Every tort, whether it be one derived from common law or a statutory tort like Title VII, requires a showing of harm.").

A.   **Plaintiff's Employment Status**

Analysis of Plaintiff's standing to pursue her retaliation claim under Title VII begins with a determination of her employment status. Both parties assume that she is a "former employee" who filed a charge a discrimination (the 1998 lawsuit) and is alleging subsequent retaliation. (Def.'s Motion for Summary Judgment, at 8; Pl.'s Response, at 7.) The court is less certain of this status. Plaintiff is indeed a former employee, due to her employment at the casino in 1994 and 1995, but her 1998 lawsuit is not directly related to her former employment. Plaintiff filed her race discrimination suit in response to the circumstances surrounding her application for employment in

---

[12] Defendant argues that *Veprinsky* effectively *requires* a nexus to employment. (Def.'s Motion for Summary Judgment., at 8 n.2.) As this court reads that case, however, *Veprinsky* recognized that acts having a nexus to employment are actionable, but did *not* hold that *only* those acts having a nexus to employment are actionable. In fact, the court noted the question of whether an unrelated act could be actionable, but declined to resolve the issue because it made no difference to the outcome of the case. *Veprinsky*, 87 F.3d at 892.

1998, not in response to anything that happened during her employment in 1994 or 1995. (Complaint ¶ 4; Pl.'s Response, at 2.) Thus, her status as a "former employee" is arguably a mere coincidence; the material facts of her 1998 suit and the present retaliation claim would be the same if she had never worked at the Grand Victoria casino.

Nor is the court confident that it is fair to characterize her as an "applicant for employment." Plaintiff was an applicant in 1998, and it was as an applicant that she filed her Title VII race discrimination suit. She has not applied for employment since then, however, and currently has no intention of applying. (Def.'s 56.1 ¶ 16.)

For purposes of this decision, the court will assume that a "former applicant for employment" has a cause of action under Title VII against an employer to whom she submitted an application for a later act of retaliation. The statute, 42 U.S.C. 2000e-3(a), uses "employees" and "applicants for employment" interchangeably, and the Supreme Court has liberally construed the term "employees" to include former employees. See Robinson, 519 U.S. at 346 (reasoning that the broad purpose of Title VII's anti-retaliation provisions is to ensure that plaintiffs have "unfettered access" to remedial measures). Assuming, then, that Plaintiff has standing as a former applicant, the court turns to the question whether the retaliatory act significantly affected her future employment prospects, had some other relation to employment, or caused her to suffer some kind of "real harm."

### B. Harm Suffered by Plaintiff

#### 1. Future Employment Prospects

If Plaintiff wanted to apply for a job at Defendant's casino, she could plausibly argue that the trespass letter affected her future job prospects.[13] Although she would be allowed to apply in person,

---

[13] Although Plaintiff has not made this argument directly, the court addresses it for (continued...)

11

she would be escorted by a security guard at all times, (Letter from Rice to Flaxman of 7/01/03, Tab F to Def.'s 56.1), circumstances that would not present a job applicant in the most favorable light. She could further argue that the options of mailing her application or submitting it online, (Def.'s 56.1 ¶ 17), may not be as effective as applying in person. Here, however, Plaintiff has admitted that she has no interest in ever applying for a job at the Grand Victoria casino. (Def.'s 56.1 ¶ 16.) She cannot show any effect on her prospects for future employment with Defendant if she has no intent of ever obtaining a position there. *See Hudson v. Chicago Transit Authority*, 375 F.3d 552, 558 (7th Cir. 2004) (African-American employee of municipal transit authority failed to establish a *prima facie* case of retaliation where he had previously sued his employer for race discrimination, was not offered a promotion, but had never actually applied for the position).

Nor is there any basis for a suspicion that the trespass letter would have any effect on her future employment prospects elsewhere. Unlike *Veprinsky*, where the former employer gave false information to the former employee's current employer, Grand Victoria's trespass letter did not communicate any negative information about Plaintiff to any other employer. 87 F.3d at 894-95; *see, e.g., Hillig v. Rumsfeld*, 381 F.3d 1028, 1035 (10th Cir. 2004) (former employee stated claim for retaliation because she "suffered more than *de minimus* harm to her future employment prospects" when her former employer gave negative recommendations to her new employer). Thus, the trespass letter falls short of adversely affecting Plaintiff's future employment prospects.

---

[13] (...continued)
completeness.

### 2. Harm Unrelated to Employment

As noted earlier, the law leaves open the question of whether a former employee (or former job applicant) can sue for retaliation under Title VII for a retaliatory act which is unrelated to employment. *See Flannery*, 354 F.3d at 642 n.3. To the extent such a claim is cognizable, the logical legal standard would be similar to the requirement for current employees; namely, that the plaintiff show "real harm." In *McDonnell*, the Seventh Circuit Court of Appeals recognized that this is a nebulous standard, but suggested that "[s]hooting a person for filing a complaint of discrimination would be an effective method of retaliation. . . . ." 84 F.3d at 259. At the other end of the spectrum, the court in *Johnson* found no "real harm" where the retaliatory act was the employer's refusal to provide a back brace for an employee injured on the job. 325 F.3d at 902. In *Ishkhanian*, a district court found actionable retaliation where the employer sued a former employee for fraud and theft. 2003 WL 21479072, *1.

Here, in contrast, Plaintiff's "harm" consists of no more than a feeling that she was insulted and that whoever sent the trespass letter was "ignorant" and "immature." (Def.'s 56.1 ¶ 19; Ellis Dep., at 32:17-33:25.) She even admits that she "wasn't really upset" by receiving the letter. (*Id.*) This is a far cry from being shot at or sued; in fact, the "harm" Plaintiff suffered is not nearly as great as that suffered by the unsuccessful plaintiff who was denied the back brace in *Johnson*. Since she has no desire to even visit the casino for any reason, it is difficult to imagine how Plaintiff can even be affected in any real way by being barred from the premises, let alone how she can show actual harm.

Assuming Plaintiff has standing to challenge the trespass letter, her retaliation claims for failure to establish any cognizable harm.

13

## III. Retaliation Claim

As noted above, Plaintiff has shown neither actual harm nor an adverse effect on her future employment prospects from her receipt of the trespass letter. As both parties have addressed Plaintiff's ability to prove retaliatory motive under the burden-shifting standards for proving such a claim, the court addresses the matter briefly. In the court's view, Plaintiff's effort to establish a "causal link" under the indirect method (unnecessary, as the Seventh Circuit explained in *Stone v. City of Indianapolis, Pub. Utils. Div.*, 281 F.3d 640, 642 (7th Cir. 2002)) may have less significance here. She arguably has direct evidence of retaliation, as it is undisputed that the only reason she received the trespass letter was the fact that she had filed a Title VII lawsuit against Defendant in 1998. Defendant argues that because it sent letters to anyone involved in any kind of litigation with the casino, the court must conclude it was not retaliating against Plaintiff for specifically filing an *employment discrimination* lawsuit. (Defendants' Reply Brief in Support of Motion for Summary Judgment, at 4.) In the court's view, however, the fact that Defendant sent the letter to all litigants against the casino does not change the fact that Plaintiff herself received it. The only difference is that other litigants may not have the same statutory protections afforded Plaintiff under Title VII.

Common to both the direct and indirect methods of proof, however, is the requirement that the plaintiff suffered an "adverse employment action." *Stone*, 281 F.3d at 644. The adverse action must be "materially adverse," not a "mere inconvenience." *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 465 (7th Cir. 2002). As noted above, Plaintiff suffered no cognizable injury from her receipt of the trespass letter: her future employment prospects have not been adversely affected, and she suffered no other actual harm. She merely thought the letter was "ignorant," but "wasn't really upset" by it. (Ellis Dep., at 32:17-25.) She has thus not been subject to any adverse action at all,

14

let alone a "materially adverse" action. *See Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996) ("not everything that makes an employee unhappy is an actionable adverse action."). Because she has shown no real harm from the trespass letter, she cannot be said to have suffered the required adverse action. Thus, even if she had standing, Plaintiff cannot establish a *prima facie* case of retaliation. Accordingly, there is no need for the court to discuss the issue of pretext.

## CONCLUSION

Defendants' motion for summary judgment (Doc. No. 21-1) is granted.

ENTER:

Dated: March 2, 2005

REBECCA R. PALLMEYER
United States District Judge